[Cite as *In re L.H.*, 2021-Ohio-3521.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

|  |  |  |
|---|---|---|
| IN RE: L.H. | : | Appellate Case No. 29119 |
| | : | |
| | : | Trial Court Case No. 2017-4297 |
| | : | |
| | : | (Appeal from Common |
| | : | Pleas Court – Juvenile Division) |
| | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 1st day of October, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by J. JOSHUA RIZZO, Atty. Reg. No. 0099218 Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Appellee, MCCS

SARA M. BARRY, Atty. Reg. No. 0090909, 301 West First Street, Suite 270, Dayton, Ohio 45402
    Attorney for Appellant, Mother

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Mother appeals from the trial court's judgment entry overruling her objections to a magistrate's decision and awarding appellee Montgomery County Children Services ("MCCS") permanent custody of Mother's child, L.H.

{¶ 2} Mother advances four assignments of error. First, she contends awarding MCCS permanent custody was against the weight of the evidence and not in the child's best interest. Second, she claims MCCS failed to make reasonable efforts to reunify her with L.H. Third, she asserts that L.H.'s guardian ad litem did not adequately investigate the child's best interest. Fourth, she argues in the alternative that the trial court should have awarded legal custody to L.H.'s maternal aunt.

{¶ 3} The record reflects that MCCS filed a dependency complaint in July 2017, alleging that L.H. had engaged in sexual contact with a sibling in Mother's home. At the time of the complaint, Mother resided with and was the adoptive parent of several siblings with developmental disabilities. They included L.H and the minor victim of the touching. As a result of the sexual touching, MCCS obtained interim temporary custody and, following a delinquency adjudication, the agency was awarded temporary custody.

{¶ 4} Upon being removed from Mother's home, L.H. initially was placed in the maternal aunt's home. After spending several months there and undergoing an assessment, L.H. was placed at the Hittle House, a residential sex-offender treatment facility in Columbus. L.H. spent approximately two years at Hittle House, where he made inconsistent progress with relapses that involved inappropriate conversations and inappropriate touching of other residents and a dog. After failing to make sustained progress, L.H. was transferred at Hittle House's request. No other Ohio residential

treatment facility would accept the child, so he was sent to the Piney Ridge treatment center in Fayetteville, Arkansas. L.H. spent six months at Piney Ridge, where he again made inconsistent progress and engaged in manipulative behavior and inappropriate touching of peers. L.H. was removed from Piney Ridge after an investigation revealed concerns about the facility's use of restraints and sedation, poor supervision of residents, cleanliness, and food quality. Upon leaving Piney Ridge, L.H. went to Perimeter of Forest City, another Arkansas residential-treatment facility. At the time of the permanent custody hearing below, L.H. had been at Perimeter of Forest City for less than two months. The child seemed to be adjusting well there, and MCCS had not received any negative reports.

{¶ 5} Following two extensions of temporary custody, MCCS filed its permanent-custody motion in May 2019. Mother responded with her own motion for legal custody. Alternatively, she requested a disposition of legal custody to her sister, L.H.'s aunt, with whom the child previously had resided. The matter proceeded to a March 3, 2020 hearing before a magistrate. Witnesses at the hearing included a caseworker, Mother, L.H.'s aunt, and the guardian ad litem. Based on the evidence presented, the magistrate filed an April 20, 2020 decision sustaining MCCS's motion, awarding the agency permanent custody, and terminating Mother's parental rights. Mother filed objections and, after obtaining a transcript, supplemental objections. Mother argued (1) the statutory best-interest factors supported returning L.H. to her, (2) her due process rights were violated when the guardian ad litem's report was not filed or exchanged until half way through the custody hearing, (3) the guardian ad litem's investigation was deficient, (4) the magistrate erred in excluding evidence and testimony about L.H.'s placement at Piney Ridge, and (5) the magistrate should have awarded legal custody to L.H.'s aunt. The trial court overruled

Mother's objections in an April 28, 2021 ruling and found that awarding MCCS permanent custody was in the child's best interest. This appeal followed.

{¶ 6} In her first assignment of error, Mother contends awarding MCCS permanent custody was against the weight of the evidence and not in L.H.'s best interest. She asserts that returning legal custody to her was in the child's best interest and that the relevant statutory factors supported such a conclusion.

{¶ 7} "R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency." *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14. "The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period. R.C. 2151.414(B)(1)." *Id.*

{¶ 8} In determining a child's best interest, R.C. 2151.414(D) directs the trial court to consider all relevant factors, including: "(1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of

a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *Id.* at ¶ 15.

{¶ 9} We review a trial court's permanent-custody determination for an abuse of discretion. *In re S.F.*, 2d Dist. Montgomery No. 28606, 2020-Ohio-693, ¶ 42. A permanent-custody determination is unreasonable, and may be reversed as an abuse of discretion, if the record lacks clear and convincing evidence "by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15; *see also In re S.F.* at ¶ 43-45.

{¶ 10} With the forgoing standards in mind, we find a lack of clear and convincing evidence to support the trial court's determination that awarding MCCS permanent custody was in L.H.'s best interest. As a threshold matter, we note that the agency's initial involvement had nothing to do with any inappropriate care or conduct by Mother. The record reflects that Mother adopted L.H. and the child's siblings when L.H. was six months old. (Hearing Tr. at 62.) MCCS became involved and filed a dependency complaint after Mother herself reported that L.H. had acted out sexually with a sibling in Mother's home. (*Id.* at 37.) A case worker admitted that Mother had been completely cooperative and had done everything asked of her. In the caseworker's opinion, there was not "anything else Mother could do right now" to regain custody. (*Id.* at 36.)

{¶ 11} MCCS's concern was that L.H. had shown inconsistent progress and had continued to act out sexually while in his residential-treatment programs. (*Id.*) The

caseworker noted that if L.H. were returned to Mother "[h]e would be in the home with his victim, who is delayed, as well as two other individuals who are delayed and have limited ability to protect themselves." (*Id.* at 22.) The caseworker explained that if MCCS obtained permanent custody L.H. would complete his current treatment at the Arkansas facility and then be placed for adoption. (*Id.* at 25, 37-38.) MCCS believed that this disposition was in L.H.'s best interest. (*Id.* at 25-26.) The guardian ad litem testified and agreed with the caseworker's assessment. While recognizing a bond between Mother and L.H., the guardian ad litem opined that awarding MCCS permanent custody was in the child's best interest because "it's gonna be a long term treatment, if he's ever getting out of treatment." (*Id.* at 89-90.) At the time of the hearing, L.H. was 13 years old and had been out of Mother's home for roughly three years. (*Id.* at 37, 56-57.)

{¶ 12} For her part, Mother agreed to keep L.H. in the Arkansas residential-treatment program if she regained custody. Upon his eventual return home, the child would have "a whole end of the house" to himself, including his own bedroom apart from his siblings, who were ages 42, 22, 20, and 16 at the time of the hearing. (*Id.* at 50-51, 60.) Mother planned to keep the siblings safe by installing surveillance cameras and other equipment in her kitchen, living room, hallway, and near the victim's bedroom. (*Id.* at 56, 61.) Mother also had taught the victim to "speak up" about any issues, and she planned to have L.H. continue with counseling if he returned home. (*Id.* at 56-57.) As for the other siblings, Mother stated that L.H. had not had any issues with them. Nevertheless, Mother had "put up walls" and doors to ensure their safety. (*Id.* at 57.) Finally, Mother noted that she lived one mile from her sister, the aunt with whom L.H. had resided for several months before entering residential treatment. Mother testified that L.H.'s aunt could provide

assistance with the child. (*Id.* at 51.)

{¶ 13} L.H.'s aunt also testified at the hearing. She confirmed her ability to help Mother with the child. L.H. stated that she had enjoyed a relationship with L.H. since his adoption at six months of age. (*Id.* at 70.) She explained that L.H. had lived with her, without any negative incidents, for four months after being removed from Mother's home and before entering a residential-treatment facility. (*Id.* at 70-71.) Consistent with Mother's alternative request for an award of legal custody to her sister, L.H.'s aunt testified that she was willing to accept custody. (*Id.* at 71.) She was divorced and living alone but recently had become engaged to be married. (*Id.* at 72, 76.) With regard to the lack of a home study, the aunt testified that she had contacted MCCS "several times" about completing it. (*Id.* at 75.) Her most recent contact had been the previous week. (*Id.* at 24.) At the time of the hearing, the aunt and the caseworker had not found a mutually agreeable time for a home visit. (*Id.* at 24, 72.) The aunt noted, however, that an MCCS representative previously had been inside her home when L.H. lived with her for four months. (*Id.* at 75.)

{¶ 14} Because MCCS's temporary custody already had been extended twice and L.H. had been in the agency's custody for more than two years, the trial court essentially had three custody options.[1] First, it could terminate parental rights and award MCCS permanent custody. Second, it could return legal custody of L.H. to Mother. Or third, it

---

[1] *See* R.C. 2151.415(D)(4) ("No court shall grant an agency more than two extensions of temporary custody pursuant to division (D) of this section and the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of this section.").

could grant Mother's alternative request and award legal custody to L.H.'s aunt.

{¶ 15} In our view, the evidence did not clearly and convincingly support the first option. The pertinent R.C. 2151.414(D) factors included: (1) L.H.'s interaction with others, including Mother, his aunt, his siblings, and "any other person who may significantly affect the child"; (2) L.H.'s wishes; (3) L.H.'s custodial history; and (4) L.H.'s need for a legally secure placement and whether such a placement could be achieved without awarding MCCS permanent custody.

{¶ 16} With regard to the first factor, the record indicates that L.H. enjoyed a loving and bonded relationship with his Mother, his aunt, and his siblings. But L.H.'s interaction with one of his siblings had involved inappropriate sexual touching approximately three years earlier. Such inappropriate behavior had continued in treatment facilities while L.H. was in the legal custody of MCCS.

{¶ 17} As for the second factor, L.H. had expressed a desire to be reunited with Mother or, alternatively, to be placed with his aunt. Mother also had expressed a desire to have legal custody returned to her.

{¶ 18} Concerning the third factor, L.H had been in MCCS's temporary custody for more than two years, and temporary custody could not be extended again. Although MCCS expressed concern about his readiness to return home to Mother, no one suggested that course of action at the time of the hearing. Mother and MCCS both planned to keep L.H. in the residential-treatment program at Perimeter of Forest City in Arkansas. And the guardian ad litem expressed an opinion that the child would need to remain in a treatment facility for a long time or, perhaps, permanently. The issue was who should have custody while he was there and whether Mother's parental rights should be

terminated, preventing him from returning to her home upon his eventual release.

{¶ 19} Finally, with regard to the fourth factor, L.H. undoubtedly needed a legally secure placement. The issue was whether such a placement could be achieved without awarding MCCS permanent custody. Upon L.H.'s completion of the program at Perimeter of Forest City, MCCS planned to place him for adoption. But 13-year-old L.H. was a developmentally disabled minority child with an IQ of approximately 62. (*Id.* at 29, 37-38.) He had mental-health diagnoses, had a history of acting out sexually, and on two occasions roughly 100 different placement facilities had refused to accept him. (*Id.*) Despite the caseworker's optimistic assurance that "every child is adoptable" (*Id.* at 38), we question L.H.'s prospects for adoption. In the permanent custody of MCCS, he likely would be relegated to a group home or foster care with strangers until reaching adulthood. In either situation, MCCS's concerns about L.H. re-engaging in inappropriate behavior still could be realized.

{¶ 20} One possibility might be to place him in an adoptive or foster home with no other children. Of course, this result could be achieved simply by awarding L.H.'s aunt legal custody. The record persuades us that awarding legal custody to L.H.'s aunt, with whom the child already had a bonded relationship, would serve his interest far better than awarding MCCS permanent custody, terminating Mother's parental rights, and extinguishing forever the only lasting relationships the child ever has known. The problem with awarding L.H.'s aunt legal custody is that a required home study had not been completed at the time of the hearing, and MCCS's temporary custody could not be extended. The record suggests that the agency also may have needed to conduct a background check on the aunt's new fiancée. In light of these issues, we believe the

evidence supported the only other option, returning L.H. to Mother's legal custody.

{¶ 21} Mother raised the denial of her own motion for legal custody as her first objection to the magistrate's decision. When deciding whether to return a child to the legal custody of a parent, courts typically look to the best-interest factors found in R.C. 3109.04(F)(1). *In re T.L.W.*, 2d Dist. Montgomery No. 28363, 2019-Ohio-3118, ¶ 28. Those factors are similar to the factors in R.C. 2151.414(D) that govern permanent custody motions, and courts sometimes apply both provisions when considering legal custody. *In re A.K.*, 2d Dist. Montgomery No. 27575, 2017-Ohio-8100, ¶ 13-14, 17.[2] Unlike permanent-custody motions, an award of legal custody only needs to be supported by the preponderance of the evidence. We apply abuse-of-discretion review to a trial court's decision on a motion for legal custody. *In re J.T.*, 2d Dist. Montgomery No. 27343, 2017-Ohio-1303, ¶ 10-11.

{¶ 22} As noted above, Mother agreed to keep L.H. in the program at Perimeter of Forest City until its completion. Returning L.H. to Mother's legal custody while he completed the program in Arkansas would not have endangered L.H.'s siblings, whereas granting MCCS permanent custody while the child remained in the program unnecessarily precluded the possibility of Mother reuniting with him.[3] Upon L.H.'s eventual completion of the Perimeter program, if Mother had legal custody she then could choose either to

---

[2] Courts may consider any relevant factors when resolving a motion for legal custody, as the factors in R.C. 3109.04(F)(1) by their own terms are non-exclusive. *See In re J.T.*, 2d Dist. Montgomery No. 27343, 2017-Ohio-1303, ¶ 13, fn. 2.

[3] We recognize that L.H. may have completed the program at Perimeter of Forest City by now. The program typically lasts up to 12 months (Hearing Tr. at 15), and the appellate record does not reveal L.H.'s current whereabouts. For purposes of our analysis, we are confined to the record as it existed at the time of the hearing.

supervise him in her home or, potentially, to allow him to reside with the aunt, who lived one mile away and had no children. At the hearing, Mother identified precautions she had taken to prevent a recurrence of the sexual touching. She also expressed her willingness to install alarms and surveillance equipment to help prevent a recurrence. If these precautions were to prove insufficient, Mother could allow L.H.'s aunt to obtain legal custody, as the aunt testified that she was willing to do. We also see no reason why an award of legal custody to Mother could not be accompanied by an order of protective supervision to MCCS, thereby enabling the agency to monitor the situation and to intervene again if necessary.

{¶ 23} With regard to the best-interest factors in R.C. 3109.04(F)(1), as relevant here they include the wishes of Mother and L.H. as well as L.H.'s interaction and relationship with others, including Mother, his siblings, and anyone else who significantly may affect his best interest. These same issues were addressed above under R.C. 2151.414(D). Two other relevant considerations under R.C. 3109.04(F)(1) were L.H.'s adjustment to his home, school, and community, and the mental and physical health of everyone involved. L.H.'s home, school, and community consisted of the Perimeter of Forest City. As noted above, he had been there a matter of weeks and seemed to be doing fine. In any event, both Mother and MCCS planned to keep him there. Finally, the record reveals no concerns about the physical or mental health of Mother or L.H.'s aunt. As for L.H.'s mental health, his propensity to act out sexually was addressed and considered above.

{¶ 24} Although the present case admittedly involves a difficult issue with no simple solution, we do not find clear and convincing evidence to support terminating

Mother's parental rights and awarding permanent custody to MCCS. At the time of the hearing, the only other potentially viable options included awarding legal custody to L.H.'s aunt or returning the child to Mother's legal custody. Because MCCS's temporary custody had expired and could not be extended and a required home study on the aunt had not been completed, the best option available to the trial court was to return legal custody to Mother, who had agreed to keep L.H. in the residential program at Perimeter of Forest City. For the reasons set forth above, we find that the preponderance of the competent, credible evidence supported that disposition and that the trial court's contrary conclusion was unreasonable. Mother's first assignment of error is sustained.

{¶ 25} Having found that Mother is entitled to have legal custody returned to her, we need not address her second, third, and fourth assignments of error. Our disposition of the first assignment of error renders moot the other issues Mother raises. Accordingly, we overrule the second, third, and fourth assignments of error as moot.

{¶ 26} The trial court's judgment is reversed, and the case is remanded for the trial court to journalize an entry awarding Mother legal custody of L.H. with a grant of protective supervision to MCCS.

. . . . . . . . . . . . .


DONOVAN, J. and WELBAUM, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
J. Joshua Rizzo
Sara M. Barry
Hon. Helen C. Wallace