[Cite as *In re A.A.R.*, 2024-Ohio-601.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

IN THE MATTER OF: A.A.R., M.R.R.,
C.W.R.

:
:
:   C.A. No. 2023-CA-39; 2023-CA-40
:
:   Trial Court Case No. 2020-C-00098-0S;
:   2020-C-00099-0S; 2020-C-00100-0S
:
:   (Appeal from Common Pleas Court-
:   Juvenile Division)
:

. . . . . . . . . .

O P I N I O N

Rendered on February 16, 2024

. . . . . . . . . .

CHRISTOPHER D. CLARK, Attorney for Appellant J.R.

TRAVIS L. KANE, Attorney for Appellant A.R.

MEGAN A. HAMMOND, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Father and Mother each appeal from the grant of legal custody of their three children, twin daughters A.A.R. and M.R.R. ("the twins") and son C.W.R., to S.L., who is the children's uncle and married to one of Father's sisters, J.L. The twins were born in 2014, and C.W.R. was born in 2020. Because the trial court reasonably concluded that

granting legal custody to S.L. was in the children's best interest and we find no abuse of discretion, the judgments of the trial court are affirmed.

## FACTS AND PROCEDURAL HISTORY

{¶ 2} Greene County Children's Services (GCCS) became involved with the family in 2020.   After C.W.R. was injured when an unsecured door in the family home fell on him, causing a head injury, and Mother and Father had positive drug screens and/or made admissions of drug use, GCCS obtained interim custody of all three children.   The children were adjudicated dependent on September 10, 2020.   GCCS was subsequently granted temporary custody of the children, pending the parents' substantial completion of their case plan objectives, with the goal of reunifying the children with their parents.   On January 14, 2022, this court affirmed the judgment of the trial court granting temporary custody of the children to GCCS.   *In re A.A.R., M.R.R., & C.W.R.*, 2d Dist. Greene No. 2021-CA-23, 2022-Ohio-93.

{¶ 3} On March 11, 2022, the magistrate granted GCCS's motion to extend temporary custody and determined that the children could not be placed with Mother or Father due to concerns about their use of illegal substances.

{¶ 4} On May 2, 2022, GCCS filed a motion to modify temporary custody to legal custody to Father's sister, R.D., and her husband, F.D., who lived in Arizona.   As of that date, the children had resided with R.D. and her family in Arizona for 11 months. GCCS subsequently withdrew the motion to modify temporary custody to R.D. and F.D.

{¶ 5} In August 2022, GCCS filed a motion to modify temporary custody to permanent custody to GCCS. According to the motion, the children had been in the

temporary custody of GCCS for 24 months by that time, and neither parent was "willing to admit or to accept the fact that there [were] safety concerns in their home" and neither had been compliant with attending recommended services or engaging in any interventions to alleviate the safety concerns that had been identified.

{¶ 6} In December 2022, GCCS filed a motion to modify disposition to a grant of legal custody to Father's brother-in-law, S.L. and Father's sister, J.L., who resided near R.D.'s family in Arizona. At the time of the motion, the children had been placed with S.L. and J.L. for two months. Mother filed a motion for parenting time and for the return of the children to her care.

{¶ 7} The court held a hearing in January 2023. On April 6, 2023, the court issued a decision granting legal custody of the children to S.L. The prosecutor orally withdrew the motion for permanent custody to GCCS. The court considered R.C. 3109.04(F) and R.C. 2151.414(D) in determining that it was in the children's best interest to award legal custody to S.L. It was significant to the court that: the children had been integrated into S.L.'s family, where their needs were being met; the twins had expressed a desire to remain there; S.L. supported the return of the children to the parents' care once they engaged in treatment; and S.L. was willing to facilitate visitation. It was also significant to the court that Mother and Father had demonstrated aggressive and inappropriate behaviors, continued to fail to complete their case plan objectives, and had not accepted accountability for their actions.

{¶ 8} Mother and Father appealed from the trial court's April 2023 judgment, but we dismissed the appeals for lack of final orders, because the April 6, 2023 judgment did

not resolve all of the issues, including visitation and child support.

{¶ 9} In May 2023, the trial court conducted a review hearing and, on June 11, 2023, the trial court issued a judgment entry that addressed the unresolved issues. The court determined that Mother and Father were each entitled to phone contact with the children once a week for 30 minutes, and the court ordered Mother and Father to pay child support. Mother and Father now appeal from the April 6 and June 11, 2023 judgments.

**Assignments of Error and Analysis**

{¶ 10} Mother and Father each assert one assignment of error; the assignments are identically phrased:

> THE TRIAL COURT ERRED IN GRANTING LEGAL CUSTODY TO PATERNAL UNCLE, [S.L.].

{¶ 11} Mother argues that the trial court relied too heavily on minor disagreements between Mother and GCCS, which portrayed Mother as "uncooperative, aggressive, or elusive." She argues that there was no evidence that she posed a substantial risk of harm to the children or was not providing for their basic needs. Father argues that he has suitable housing for the children, is drug-free, participates in counseling, and is bonded to the children, as confirmed by "multiple witnesses." Father argues that the trial court "focused significantly" on his drug use, which occurred in the past. Like Mother, Father argues that the court relied too heavily on his "unwillingness to cooperate with GCCS and not enough on [his] history of raising these children."

{¶ 12} The State responds that Mother and Father "primarily focus on their

completion of case plan objectives," but it points out that, in determining the children's best interest, "the focus is on the children, not the parents"; the "trial court's polestar was the children's particular needs." The State argues that Mother blames Father's family for GCCS's involvement with the children while completely disregarding the allegations underlying the initial complaints (namely substance abuse.) The State also notes that Father failed to take responsibility for his history of drug abuse, left Ohio due to a warrant issued for his arrest in October 2022, and was the subject of a restraining order obtained by S.L.

{¶ 13} At the hearing on January 10, 2023, S.L. testified via Zoom that he is the husband of Father's sister, J.L., and lives in Gilbert, Arizona, in a six-bedroom home with J.L., their five children, and Mother and Father's three children. (J.L. did not participate in the hearing.) S.L. stated that Mother and Father's children had resided with R.D.'s family for about 18 months before coming to live in his home on November 4, 2022. The two families live near each other, and during the 18 months that the children resided with R.D.'s family, S.L. and J.L. saw the children regularly at family get-togethers and events. According to S.L., when R.D.'s family learned of a medical issue that would make it difficult for them to continue to care for the three children, S.L. and his wife expressed a desire to become their legal guardians. Thorough background checks and a home study were then completed.

{¶ 14} S.L. communicated with GCCS staff via phone and email. S.L. testified that on December 29, 2022, while the children were living with him, he received an email purportedly from Nicole Larson, a GCCS supervisor, at an email address that he used

"just for this case." Only Mother, Father, and Larson had been given this particular email address. According to S.L., the email stated that the children had been placed illegally into his home and that, due to his criminal background and several domestic violence charges against him, the children needed to be "returned to Ohio immediately." S.L. stated that he had no criminal convictions, and he never ascertained the identity of the sender of the email.

{¶ 15} S.L. testified that Father resided with Father's parents in Arizona. Father had refused to agree to certain terms for parenting time with the children at S.L.'s home. S.L. stated that, while he was speaking to Father's parents on speaker phone about the parenting time, S.L. heard Father in the background "threaten[ing] to come over and kill me." S.L. also received text messages from Father that caused him concern. As a result, he and his wife had obtained an ex parte order of protection against Father, without naming the children in the order; a full hearing on the order was imminent at the time of S.L.'s testimony.

{¶ 16} S.L. stated that he was willing to facilitate visitation with Mother and Father if he were granted legal custody. He expected Father to "not be belligerent, to be positive" during visits, and Father "did not agree to the terms of the visit." S.L. described reasonable visitation as "any visitation that is positive and uplifting to the children." S.L. objected to Mother visiting the children in his home due to "belligerent emails and texts" that she had sent him. S.L. stated that he owned two companies, was both a general contractor and a home inspector, and could set his own schedule. J.L. was a stay-at-home mother. S.L. believed that giving him legal custody of the children was in their best

interest, especially for the twins, because they knew and loved their parents and should be able to maintain a relationship with them.

{¶ 17} Nicole Larson, a supervisor at GCCS, was initially assigned the family's case in the summer of 2020; the agency had opened the case in March of that year on reports of mental health issues and drug use. Larson testified that GCCS had learned that the family lived in Arizona in September 2019 but had left that state before the completion of an investigation by the children's services agency there. Further, the family had previously been involved with a children's services agency in Texas after their vehicle broke down there on their way to Ohio from Arizona.

{¶ 18} The initial case plan for the family was prepared in June 2020. Larson noted that, at that time, C.W.R. had not yet been born. The plan required Mother and Father to provide the twins with safe, stable, drug- and violence-free housing without abuse or neglect. They were also required to obtain mental health assessments and follow all recommendations from any health care professionals to address mental health concerns and parenting techniques. They were required to provide random negative drug screens and sign releases to allow caseworkers to confirm their progress with service providers. Mother and Father were required to meet with GCCS monthly.

{¶ 19} Larson testified that the case plan was amended in August 2020, after C.W.R. was born and the children came into agency custody. The plan was amended again in February 2021, after the parents were barred from having visitation with the children at the Greene County Visitation Center ("GCVC"); Mother and Father were then additionally required to obtain parenting psychological assessments. Because the

parents had not engaged in any random drug screens, they were also required to complete hair follicle testing. Finally, the case plan was amended in June 2021 to reflect that the children were residing in Arizona with family members and that visitation would occur via Zoom.

**{¶ 20}** Larson stated that, when making referrals for assessments, GCCS includes background information regarding the agency's specific concerns for each parent. Although he was advised that any assessment would not be considered complete without specific agency referral, Father completed two mental health assessments privately without such input from GCCS; no services were recommended based upon his self-reporting. Father failed to submit to random drug screens after May 2020.

**{¶ 21}** Mother and Father have not resided together since April 2022; at that time, Mother advised Larson that she was considering a divorce. Larson testified stated that, at the beginning of the case, Mother and Father rented a home in Fairborn, from which the children were removed and placed into foster care. In September 2020, the parents were asked to leave the Fairborn home. Mother and Father then lived at various times in hotels, with friends, and finally in a Fairborn apartment. They had faced eviction twice, and GCCS had "facilitated paying" approximately $1,400 in charges between the end of January and April 2022 in order to prevent their eviction," as well as an additional month's rent. Larson stated that Father moved to Arizona in October 2022; at the time of the hearing, Mother reported living alone in Celina in a duplex.

**{¶ 22}** Larson testified that Mother had successfully completed her mental health assessment in Celina with an entity called Momentum Counseling in June 2022. Like

Father, Mother also completed three other assessments without referral information from the agency, and those assessments were not accepted.

{¶ 23} The children were moved to Arizona on May 28, 2021, at the end of the school year, due to the parents' lack of progress on their case plans. The children initially resided with R.D.'s family, which had been approved through an Interstate Compact for Placement of Children ("ICPC") investigation prior to the move. At this point, GCCS had been involved with the children for about a year, and the agency wanted to find some permanency for them as opposed to foster placement. R.D., Father's sister, agreed to facilitate 30-minute video visits between the parents and the children twice a week. According to Larson, Mother and Father had been repeatedly instructed to engage in positive interactions with the children during these visits.

{¶ 24} Larson received multiple emails from R.D. regarding visits that R.D. characterized as negative. During one such visit, one of the children became rambunctious and threw something that almost hit the computer; when R.D. tried to interject, Mother "started saying, no, you don't tell my kids what to do, they're my children," and other negative comments. There were "multiple other times" when Mother made "snide remarks" about the kids not being theirs, about the kids not having to listen to R.D., and about hoping that R.D. got "hit by a bus." According to Larson, the visits were "just not positive for the children at all." Although GCCS sought a grant of legal custody to R.D.'s family in May 2022, the motion was withdrawn a month later because R.D.'s family's relationship with the parents continued to deteriorate; R.D. indicated they were no longer willing to go forward with legal custody due to the obligations they would still

have to the parents.

{¶ 25} According to Larson, S.L. agreed to facilitate visitation, but he "didn't want to have a tumultuous relationship in trying to do that." The parents were again advised to be respectful and to focus on interacting with their children during visitation. Larson stated that Father "needed a lot of prompting" to agree to those parameters, and Mother never did agree; she was "belligerent and argumentative." On December 30, 2022, S.L. spoke to Larson regarding the unusual had email he received and also forwarded it to her. Larson testified that, although the email appeared to have been sent from her, it was not. Larson never authorized the children's removal and return to Ohio, and she did not know who sent the email.

{¶ 26} Larson cited concerns over Mother and Father's housing, Mother's extremely aggressive and erratic behavior when she was contradicted, Father's avoidance of issues, and the general failure of both parents to take responsibility for concerns regarding their care of the children and their inability to recognize when they were placing their children in danger. Larson also expressed concerns about untreated mental health and substance abuse issues involving both parents.

{¶ 27} Mother had reported to Larson that she worked for a friend repossessing salvage vehicles; Larson did not know if Father was employed, given her sporadic contact with him. Larson spoke to Father within a week of his arrival in Arizona, and he indicated that he had left Ohio because he had an active warrant. Larson requested information about Father's mental health provider to obtain releases of information, but Father did not respond; he also did not provide results of any random drug screens. Larson indicated

that in every "single conversation that we've ever had with regard to this case with either parent[,] we have always discussed what the concerns are, why the services were not completed appropriately, and what needed to be done to remedy that issue." Larson indicated that Father was easier to work with than Mother, but he did not consistently attend scheduled meetings, and sometimes there was no contact with him for two or three months. At the time of the hearing, Father resided in his parents' home.

{¶ 28} Larson expressed her opinion that legal custody in favor of S.L. was in the children's best interest. S.L. had advised Larson that he did not want to sever Mother and Father's parental rights in the event Mother and Father were ultimately able to address the agency's concerns. She said that S.L. was "very communicative" and sought advice about what was in the best interest of the children. According to the ICPC evaluation, S.L. was able to support the children financially and emotionally. Larson testified that Mother and Father's case plans remained incomplete as of the date of the hearing.

{¶ 29} Dr. Antoninette Cordell, a clinical psychologist with expertise working with families toward reunification, was designated by the court as an expert in psychology. Cordell completed Mother's psychological evaluation and parenting assessment, which encompassed considerations of mental health, personality, and parenting, with input from GCCS. The evaluation included psychological tests and observations of Mother with her children.

{¶ 30} Between January 10 and February 14, 2022, Cordell interviewed Mother and Mother completed the Minnesota Multiphasic Personality Inventory ("MMPI-3"), the

Rotter Sentence Completion Test, the Parenting Relationship Questionnaire ("PRP"), and a Parenting Assessment Interview. Dr. Cordell also observed a family visit.

{¶ 31} On the MMPI-3, Cordell indicated that Mother had provided an "unrealistic assessment of her functioning" and failed to acknowledge that she "had any problems at all." Mother presented herself as well-adjusted, and Cordell expressed concern that Mother's failure to acknowledge any problems would prevent her from addressing them.

{¶ 32} Cordell stated that Mother had completed the PRP "according to what her memory was of when she was parenting," because a significant period of time had elapsed since she had parented the children, and the test was limited to the twins. Cordell indicated that Mother "weighted herself as very high, significantly high on a number of scales," such as attachment and communication. Mother reported that her children would regularly tell her about daily events, school activities, interaction with friends, and problems they might be having, but that some of those ratings were so high as to be "somewhat unrealistic." Mother rated herself "very, very low" and inconsistent on discipline practices and described a permissive parenting style. Mother further rated herself as "very, very involved with all kinds of activities with the children and as very confident as a parent to make good parenting decisions."

{¶ 33} Cordell observed Mother with the children via Zoom, and Mother requested that the session occur at her home because she had spent a lot of time making a large checkers game for the children that would be difficult to transport to Cordell's office. Cordell advised Mother in advance that the session was not a regular visitation that included Father but was limited to an evaluation of Mother; however, when the children

were not responsive to the game, Father appeared on the screen. Cordell objected, but Mother argued and stated that Father would miss his visitation. Cordell also stated that C.W.R. was not initially responsive to Mother during this visit, but then when he did reach for her, "she totally missed that, * * * that he was actually responding to her." According to Cordell, Mother became "very frustrated" that the children were not responding to her the way she thought they should. Mother made comments that Cordell characterized as "off-beat," for example, telling the children they should be grateful for Cordell's assistance and also for "lettuce."

{¶ 34} Cordell testified that Mother asked the children what they were allowed to do while with their relatives. Mother then told the children that they were all going to dance, and she put on some music, but it was "not a children's song at all." Mother continued to have trouble connecting with the children, asked to have Father return, and "didn't like it" when told no. After the twins indicated that they were bored and the session ended, Mother advised Cordell, "that tears my f****** soul up." The session ended 20 minutes early. Mother then asked Cordell if she could take home a portion of the MMPI-3 "to get [Father] prepared to take it," which Cordell described as "a total manipulation" and something that should not be done, but Mother "did not seem to understand that."

{¶ 35} Based upon her testing and observation, Cordell testified that Mother had a great deal of difficulty taking responsibility for her own actions, parenting her children, and making improvements in that area. According to Cordell, Mother appeared to "qualify for a personality disorder * * * what you might call codependency in relation to her husband." Cordell stated that Mother seemed "hypomanic" when she talked; everything Mother did

was "kind of illogical and out of sequence, [with] all kinds of details without context * * *, that it would appear that something along the lines of cyclothymic disorder with anxious distress" applied to her. Cordell described Mother as "being all over the place," with a lot of energy that was not directed in a constructive way. For example, Mother was unable to identify the problems in her situation and in parenting the children such that problem solving and decision-making appeared "to be at that time insurmountable." Cordell opined to a reasonable degree of psychological certainty that Mother was unable to safely care for the children on a full-time basis. Mother had last seen the children in May 2021.

{¶ 36} Libby Powers, the program coordinator for the Greene County Visitation Center (GCVC), which offers supervised visitation services, testified that Mother and Father had agreed to abide by the explicit rules for visitation at the center before any visits began. Four visits occurred between August 17 and October 30, 2020, which were observed by GCVC staff and documented. Mother attended all the visits and Father attended three. According to Powers, on October 12, 2020, Mother brought a concealed knife to the center and violated several other rules, including being disrespectful to staff, making promises regarding future visitation and living arrangements (without knowing what those would be), bringing some items without prior approval, and taking a child to the restroom without notifying staff.

{¶ 37} Between November 2, 2020, and early 2021, 12 visits occurred and were attended by both Mother and Father; C.W.R. attended nine of those visits. On November 13, 2020, Mother called GCVC ahead of visitation and advised that she was at the police

station filing a missing person report for Father. Mother stated that Father had indicated that he intended to end his life but wanted to attend the visit to say good-bye to the children. The parents subsequently arrived, and Powers requested safety personnel to attend the visit.

{¶ 38} Powers stated that the last visit to occur at the center was on January 17, 2021. At that time, Mother became upset and indicated to staff that she wasn't going to allow the children to return to the foster home. Mother stated that she believed the children were being molested in their foster home and that she was going to take the children with her from GCVC. Staff and safety personnel contacted the Xenia Police Department for backup, and the center terminated visitation for the parents. Powers stated that, in addition to the events of January 17, 2021, there "was a history of several violations of our policies and procedures from the beginning of the visits." According to Powers, any time they call law enforcement, it's considered "a critical incident"; safety was always their first concern, and there were other families in the center at the time.

{¶ 39} Doris Lopez, the court-appointed special advocate ("CASA") for the case, was assigned in August 2022. She testified that she had reviewed the CASA file and reports of the previous CASA, Margaret Neff. Lopez testified that the twins both told her, via Zoom, that they wanted to stay where they were living "forever" and wanted to live in a home "without yelling and screaming." A.A.R. also expressed that she wished "her dad would have his brain taken out" and "fixed so it would be normal again."

{¶ 40} Lopez had not had any contact with Father. She had attempted to contact Father for her report eight times via phone and email without success, including three

times in one day; Father had also missed a Zoom meeting with Lopez.

{¶ 41} Lopez had met with Mother once and reviewed videos of her visitations. She stated that her relationship with Mother was "productive" until Lopez issued her preliminary report, at which point Mother "completely changed her attitude" toward Lopez; Mother contacted Lopez's supervisor and filed a complaint with the Ohio CASA Program. Lopez's report stated that she had received an email from Mother stating: "You're not very bright. * * * I will be reporting your blatant disregard of the law to the authorities as well. I want you removed from the case. You don't play by the rules, and my kids deserve better."

{¶ 42} Lopez observed interactions between Mother, Father, and R.D. in the videos that she characterized as "extremely tense and tumultuous." She testified that Mother initiated discussion with the children pertaining to "adult topics." Lopez noted that Mother and Father appeared to care for their children very much, but neither one addressed what was "going on with them in order to do what they need to do * * * to get their children back." According to Lopez, Mother and Father were often "trying to prove they're the smartest people in the room," when their energy should have been directed toward getting their children back.

{¶ 43} Lopez stated that Mother acted "as a codependent" with Father. When asked if she had observed any change in demeanor in the children, Lopez stated that M.R.R. had withdrawn from her parents and once refused to get on a Zoom visit with them. According to Lopez, Mother one time "blew up" at R.D., telling the children they could ignore R.D. and calling R.D. names; in response, the twins scolded Mother.

M.R.R. said "you don't ignore the person who's taking care of you." Lopez recommended legal custody to S.L. in hopes that Mother and Father could at some point resume a relationship with their children.

{¶ 44} Margaret Neff, who had previously been assigned as the CASA for C.W.R., said she had been concerned when the children were moved from Ohio to Arizona; she believed the case had "kind of been predetermined from the very beginning," that Mother "would never get her kids back," and that, with the move, there was "no chance of any kind of visitation," which Neff characterized as "unfair." Neff had remained in contact with Mother after her services as a CASA ended. Neff stated that Mother never appeared to be impaired or under the influence in any of her contacts with her. Neff acknowledged that Mother can be aggressive vocally and that she can be a challenge to work with, but that she is not violent. In response to questions by the prosecutor, Neff indicated that she believed GCCS had been wrong in allowing the children to move to Arizona, and she believed the incident in which C.W.R. was injured by the door was accidental. Neff acknowledged she did not know that Father had overdosed two weeks before her release from the case, that both parents had pending felony charges against them, or that the paternal grandfather had obtained a protection order against Mother.

{¶ 45} During Mother's testimony, she identified family photographs of the children and her three-bedroom home in Celina, her lease agreement, and a Celina utility bill in her name. Mother also identified negative drug test results, including one obtained on May 17, 2021, at an Urgent Care at the recommendation of Neff. Mother testified that she "got tired of them not drug testing me."

{¶ 46} Mother acknowledged that there had been four case plans and claimed that she had not been told about the case plans until she got the time-stamped court copy in the mail; she "was not involved in making them."  She stated that she did not receive any verbal or written communications regarding meetings about the case plans, although she had been available to meet.

{¶ 47} Regarding visitation, Mother described staff "always yelling" at her about "taking [her] mask down so [her] infant could see [her] face."  Mother felt like she was "reprimanded constantly" and had someone "over [her] shoulder at all times."  Mother testified that she once brought a knife to visitation to "cut braciole" she had made, but they wouldn't let her bring it in.  She said the knife was a kitchen knife and was not in her pants.  Mother stated she was occasionally allowed to bring food and she brought a "whole picnic basket" to each visit.

{¶ 48} According to Mother, on January 17, 2021, the twins revealed that their then-foster parents had had some "church friends" over to observe the twins taking showers, to make sure they were washing properly.  Mother's "instant reaction clearly was tears" as she questioned the girls and asked GCVC staff to call the police.  Father was holding C.W.R. at the time.  When the police arrived, they "yelled at [Father] to put down the baby," called Mother "a dirt bag," and refused to listen to her; she was told that she "had to hand [her] babies back to those monsters." Mother denied threatening to leave the center with the children and that she and Father were criminally charged as a result of the incident.

{¶ 49} Mother testified that she had resided at her Fairborn home until June 2021,

when the house was condemned "because the door fell down" on C.W.R; she claimed that eviction proceedings had been commenced against her and Father, but they "won." Mother and Father then stayed at two different hotels in Fairborn for a period of six months before moving to an apartment in Fairborn, where they remained from January to May 2022. At that time, Mother moved into her current home in Celina; Father initially remained in the apartment. Mother and Father "were going through a separation" and "were starting divorce," but they remained friends.

{¶ 50} Mother testified that Father was "an amazing father" who loved his kids "more than anything" and spent lots of time with them, teaching them to swim and taking them to the park every day. She stated that the children were her world and that she provided for them and "made sure they had everything that they could possibly need."

{¶ 51} Mother did not know if Father was employed at the time of the hearing. She testified that she worked in "automobile salvage and recycling," having done so since May 2022. Mother held "a few different dental licenses" and testified that, prior to the custody issue, she had applied and been accepted to law school.

{¶ 52} Mother stated that GCCS became involved with the family because Father's family had lied to the agency numerous times. Mother stated that she and Father had lived in Gilbert, Arizona, from 2015 to 2019 before moving to Texas; while in Arizona, Father's parents "called child services on us, but they never opened a case."

{¶ 53} According to Mother, she fully cooperated with Dr. Cordell. When asked about telling the children to be thankful for "lettuce," Mother stated that she wanted her children to "appreciate little things"; she also said she told the twins that Cordell was trying

to help the family. Regarding the song she played at visitation, Mother stated that the girls had been familiar with it and "it was a radio edited version."

{¶ 54} Mother denied knowing about GCCS's requirement that referrals for evaluations include background information regarding agency concerns. She also testified that, when a caseworker came to her home to administer a drug test by means of an oral swab, the caseworker had not followed the manufacturer's instructions on how to administer the test; when Mother objected, the test did not take place. According to Mother, there were no other random tests administered by GCCS, and she became upset that she kept being told that she wasn't complying with random drug screens. Mother stated that she had two evaluations done on her own in the fall of 2020 and signed releases. According to Mother, GCCS "didn't like the results of the screens because they're trying to make me look like * * * something that I'm not, so they were saying I was doing it incorrectly."

{¶ 55} Mother testified that she was not involved in mental health counseling, although she had sought counseling without a GCCS referral after moving to Celina. She was unable to remember the name of the counselor or her organization. According to Mother, the counselor had not wanted to work with GCCS but instead wanted "to actually help people" and not be lied to. Mother stated that she did not feel that she had any mental health issues.

{¶ 56} Mother described her housing as stable and denied having a drug problem. Mother testified that the return of her children to her care was in their best interest because "science had proven the damage that could be done" to the children "because

of being taken away and kept from their biological mother, who they had a bonded relationship with. They're screwing with their lives." Mother stated that she was able to parent the children, that Father should have the same kind of contact with them, and that they would "definitely work out as a team." Mother had no concerns about Father parenting the children. If the court were to award legal custody to S.L., Mother wanted to "be involved in their school, their medical, their religion, * * * everything." Mother stated that she was willing to abide by all rules of the court.

{¶ 57} On cross-examination, Mother acknowledged that she had never sent her lease agreement to GCCS, but she also stated that the agency had never asked for it. After several questions, Mother acknowledged participating in monthly meetings where versions of the case plans were discussed, but she claimed that most of the discussion had been about "how the case plan was incorrect." Mother acknowledged being late to the visitation center on November 13, 2020, after Father made suicidal comments, and said she had been worried about missing the visit and having visitation terminated. When asked why GCVC records did not reflect Mother's concerns about the twins' showering in front of others, she responded that she was "not surprised" because there were untrue things in the record. Mother acknowledged that she had been arrested for resisting arrest 12 days before the hearing and that children services had come to their home in Texas once because Father's family had told the agency that they "fled from a case." Mother stated that they left Texas within a month of the agency visit. Mother admitted being charged with drug paraphernalia in November 2022 by the Celina Police Department; that case was pending.

{¶ 58} Father testified that he was 38 years old and living in Gilbert, Arizona. He testified that he had suitable housing. His relationship with S.L. was "nonexistent" at the time of the hearing due to the restraining order obtained by S.L. Father stated that a third-party was needed to arrange visitation. Father denied seeing the case plans other than the original one that he signed. When asked for his understanding of GCCS's expectations, Father stated that "they kept saying it's not good enough, we need more, we need this. I thought I did plenty and they just didn't seem like that was enough for them."

{¶ 59} Father testified that he had used drugs in the past but did not do so anymore. He acknowledged that he had overdosed on drugs right before the children moved to Arizona. When asked about the drug paraphernalia found in his home, he stated that he had "had problems way in the past" and did not know where the paraphernalia came from "to this day."

{¶ 60} Father indicated that he was in counseling and met with his counselor once a week for about an hour or hour and a half. He only knew the counselor's first name and not the name of the group where she practiced. He stated he had been in treatment since November 2022 for "an all around, anything, any kind of mental problems or any kind of stressors" and how to deal with things, and he had "come a long way" since starting with this counselor.

{¶ 61} Father stated that when he attempted to complete a psychological evaluation, he "poured [his] heart out to tell [his] situation and look for answers," and the guy sitting there was sleeping, so Father did not return. Father acknowledged meeting

the case workers about only once every three months, which he attributed to working for a hotel 24/7 as their head of maintenance, so he was busy.

{¶ 62} Father stated that S.L. and S.L.'s wife assumed that their sole job was to protect the kids from him   Father stated that he had asked S.L. if he could attend church with the children as a family, and instead S.L. got a restraining order saying that Father had threatened to kill him, which was untrue. Father had last seen his children on November 4, 2022.   He stated that he was "absolutely" bonded with his children.

{¶ 63} On cross-examination by the prosecutor, Father acknowledged that he had overdosed on drugs in April 2021, between the opening of the GCCS case in March 2020 and the children's move to Arizona in May 2021. Father denied telling a GCCS caseworker that he had used illegal drugs since the beginning of the case.   Father stated that he did not cooperate with random drug screens because he disagreed "with their tactics" and did not trust GCCS.   He acknowledged that there was an active warrant for his arrest in Ohio.

{¶ 64} When courts make custody decisions, they "must do so in accordance with the 'best interest of the child' as forth in R.C. 3109.04(F)(1)." *In re D.S.,* 2d Dist. Clark No. 2013-CA-51, 2014-Ohio-2444, ¶ 9, citing *In re Poling*, 64 Ohio St.3d 21, 594 N.E.2d 589 (1992) and R.C. 2151.23(F).   Those factors are similar to the factors in R.C. 2151.414(D), which govern permanent custody motions, and courts sometimes apply both provisions when considering legal custody. *In re L.H.,* 2021-Ohio-3521, 179 N.E.3d 214, ¶ 21 (2d Dist.), citing *In re A.K.*, 2d Dist. Montgomery No. 27575, 2017-Ohio-8100, ¶ 13-17.   "Courts may consider any relevant factor when resolving a motion for legal

custody, as the factors in R.C. 3109.04(F)(1) by their own terms are non-exclusive." *Id.* at fn. 2. "Unlike permanent-custody motions, an award of legal custody only needs to be supported by the preponderance of the evidence." *Id.* at ¶21.

**{¶ 65}** We apply abuse-of-discretion review to a trial court's decision on a motion for legal custody. *In re J.T.*, 2d Dist. Montgomery No. 27343, 2017-Ohio-1303, ¶ 10. " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary, or unconscionable." (Citation omitted.) *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). The Ohio Supreme Court has emphasized that "most instances of abuse of discretion will result in decisions that are simply unreasonable." *Id.* "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

**{¶ 66}** R.C. 3109.04(F)(1) requires the court to consider all relevant factors in ascertaining the best interest of the child, including but not limited to: (a) the wishes of the child's parents regarding the child's care; (b) the wishes and concerns of the child; (c) the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (d) the child's adjustment to the child's home, school, and community; (e) the mental and physical health of all persons involved; (f) the parent more likely to honor and facilitate court-approved parenting time rights or visitation; (g) whether either parent has failed to make all child support payments; (h) whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; i) whether the residential parent has

continuously and willfully denied the other parent's right to parenting time; and (j) whether either parent plans to establish a residence outside of Ohio.

{¶ 67} R.C. 2151.414(D)(1) also provides a non-exhaustive list of factors for the court's consideration in determining the child's best interest: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, and any other person who may significantly affect the child; (b) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (c) the custodial history of the child; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child.

{¶ 68} After specifically considering the factors in R.C. 3109.04(F)(1) and R.C. 2151.414(D)(1), the trial court concluded that it was in the children's best interest to grant legal custody to S.L. We find no abuse of discretion in the court's analysis. S.L. had the means to financially support the children and meet their needs. Significantly, S.L. and J.L. were able and willing to care for the children until Mother and Father were able to regain custody and recognized the importance of the children's bond with their parents. The court noted that Mother and Father's love for the children was not in dispute, and GCCS and S.L. supported the goal of reunification.

{¶ 69} Both parents, however, had been noncompliant with GCCS, despite being repeatedly advised of agency rules and expectations. Mother and Father further apparently evaded inquiries from a children's services agency in Arizona, which Mother

blamed on Father's parents, and a children's services agency in Texas which had also apparently expressed concern for the children.

{¶ 70} Regarding Mother, we share the concern noted by the trial court regarding her erratic behavior. Visitation at the GCVC was terminated based upon the history of rules violations, which included Mother's bringing a concealed knife to a visit, attempting to prevent the children's departure from the facility with their foster family, and displaying aggressive behavior that caused GCVC personnel to be concerned about the safety of others at the facility. Mother's behavior at GCVC resulted in allegations of assault, and Mother mischaracterizes these events in her brief as "minor incidents."

{¶ 71} According to Larson, Mother further inappropriately addressed R.D. during Zoom visits. R.D. declined to seek legal custody of the children in part due to the obligation of further interaction with Mother. We agree with the trial court that this "level of aggressions" caused concern about any unsupervised interaction between the parents and children until the parents engaged in treatment and recognized that their inability to regulate their emotions was causing harm to the children. S.L. also objected to Mother's having visitation in his home because of ongoing belligerent communications by Mother. Mother's emotional instability apparently remained unaddressed as reflected in the court's June 11, 2023 judgment entry.

{¶ 72} Mother's unrealistic self-assessments supported Cordell's opinion regarding Mother's failure to make progress addressing GCCS concerns. Mother remained unable to understand her own role in her circumstances and to accept accountability for her behavior instead assigning blame to others. Cordell described

Mother's ability to identify and address GCCS issues as "insurmountable," and Mother's behavior as hypomanic and codependent on Father. Mother could not successfully complete a 60-minute visitation with the children, and Cordell opined that Mother was unable to care for her children to a reasonable degree of psychological certainty. Mother's inappropriate choice of music further demonstrated that she lacked an understanding of age-appropriate activities for the children. Despite the overwhelming evidence, Mother continued to deny having any mental health issues.

{¶ 73} Regarding Father, although he asserted that he had stable housing, he was living with his parents, and his employment status was unknown. He argues that he is drug-free and in counseling, but he had not submitted to drug testing since May 2020 because he disagreed with the "tactics" used by GCCS. Father refused to comply with S.L.'s reasonable expectations for positive visitations, causing S.L. to obtain a protection order against him. Larson described Father as "not present," and Lopez had had no contact at all with Father. Father had moved to Arizona as the result of a warrant in Ohio.

{¶ 74} The children had not lived with their parents since August 2020, and the twins expressly stated that they want to remain with S.L. in Arizona. C.W.R. was too young to express his wishes. The children were in need of a secure placement, and we share the trial court's hope that the placement will ultimately be with Mother and Father. As the trial court further noted, neither parent has been charged with an offense involving a child victim, and they have not been accused of withholding medical treatment or nutrition from the children. Neither parent abandoned the children, and each supports the placement of the children in the other's care. Neither have had their parental rights

terminated with respect to a sibling of the children.

{¶ 75} The children are adjusted and integrated into S.L.'s home. There was no evidence that the children were suffering from any mental or physical health issues or struggling academically. In other words, the evidence overwhelmingly supported the determination that awarding legal custody to S.L. was in the children's best interest.

{¶ 76} Based upon the foregoing, Mother's and Father's individually assigned errors are overruled.

{¶ 77} The judgments of the trial court are affirmed.

. . . . . . . . . . . . .


EPLEY, P.J. and WELBAUM, J., concur.